# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

KITTIE K. NICLEY                                                                    PLAINTIFF


v.                                      NO. 3:15-cv-00144 PSH


CAROLYN W. COLVIN, Acting Commissioner                                   DEFENDANT
of the Social Security Administration


## MEMORANDUM OPINION AND ORDER


Plaintiff Kittie K. Nicley ("Nicley") commenced this case by filing a complaint

pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the

Acting Commissioner of the Social Security Administration ("Commissioner"), a decision

based upon findings made by an Administrative Law Judge ("ALJ").

Nicley maintains that the ALJ's findings are not supported by substantial evidence

on the record as a whole and offers several reasons why.[1] Nicley first maintains that her

residual functional capacity was not properly assessed because the opinions of her

treating physician were erroneously discounted and because Nicley's subjective

complaints were not adequately evaluated.

---

[1]

The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010). In making the assessment, a treating physician's medical opinion is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006) (internal quotations omitted). The ALJ may discount the opinion if "other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of his opinion." See Id. (internal quotations omitted).

As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)]. The ALJ need not explicitly discuss each Polaski v. Heckler factor but "only need acknowledge and consider those factors before discounting a claimant's subjective complaints." See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004).

The medical evidence reflects that Dr. Bruce Randolph, M.D., ("Randolph") saw Nicley for a consultative examination in July of 2010, or approximately three months after Nicley's alleged onset date. See Transcript at 285-289.[2] Randolph recorded Nicley's medical history and noted the following: she reported an eight year history of low back and knee pain interfering with her ability to sit and stand for long periods of time, she reported increased pain with bending and climbing stairs, and she reported using over-the-counter medication to treat her pain. He observed that she had some stiffness and muscle weakness in her back and a limited range of motion in her back, hips, knees, and ankles. He found no evidence of muscle spasms, her straight leg raising was negative, and she had normal limb function and a normal gait/coordination. Randolph diagnosed arthritis in Nicley's hips and knees, back pain likely caused by degenerative disc disease, and obesity. He opined that she is moderately limited in standing/walking, bending, twisting, squatting, and climbing.

Randolph referred Nicley to St. Bernards Medical Center where x-rays were taken of her lumbar spine, hips, and right knee. See Transcript at 290-295. Dr. Adam Cabell, M.D., interpreted the results of the testing and found the following: the x-ray of Nicley's lumbar spine revealed no fracture or displacement of her spine, the x-ray of her hips revealed only mild degenerative changes, and the views of her right knee were unremarkable.

---

[2]

It appears that Randolph saw Nicley for a consultative examination in connection with a prior, unsuccessful application for disability benefits.

The record reflects that Nicley sought no medical attention for her complaints for approximately the next twenty months, and it was not until April of 2012 that she was seen by Dr. Roger Troxel, M.D., ("Troxel") for a consultative examination. See Transcript at 298-303.[3] Troxel recorded Nicley's medical history and noted her complaints of chronic cervical spine pain, osteoarthritis, depression, and elevated blood pressure. She reported taking no medication at that time. He observed that she had a normal range of motion in her extremities and cervical spine but had a limited range of motion in her lumbar spine. He found no evidence of muscle spasms, her straight leg raising on her right side was negative but positive to forty degrees on her left side, and she had normal limb function and a normal gait/coordination. Troxel diagnosed lumbar spondylosis, osteoarthritis, and depression. He opined that she has a mildly decreased ability to lift and stand but otherwise has no significantly decreased abilities.

Troxel referred Nicley to St. Bernards Medical Center where x-rays were taken of her lumbar spine, right hip, and right knee. See Transcript at 304-311. Dr. Kenneth Tidwell, Jr., M.D., interpreted the results of the testing and found the following: the x-ray of Nicley's lumbar spine revealed mild degenerative changes but no fractures or displacements, the x-ray of her right hip revealed minimal degenerative changes but no evidence of any acute bony injuries or other osseous disease, and the views of her right knee showed no bony abnormalities.

---

[3]

It appears that Troxel saw Nicley for a consultative examination in connection with her present applications for disability insurance benefits and supplemental security income payments.

Beginning in July of 2012 and continuing through August of 2013, Nicley was seen by Dr. Roland Hollis, M.D., ("Hollis") for complaints of, inter alia, low back and knee pain. See Transcript at 371 (07-18-2012), 370 (08-16-2012), 369 (10-15-2012), 368 (12-14-2012), 367 (02-12-2013), 366 (04-10-2013), 365 (06-07-2013), 364 (08-06-2013). Hollis' progress notes contain minimal findings but do reflect that the severity of Nicley's pain improved with prescription medication. There were instances in which she reported an increase in the severity of her pain, but it appears that she attributed the increase in the severity of her pain, at least in part, to a change in the weather. Hollis recommended testing to determine the cause of Nicley's pain, but it is not clear whether the testing was ever performed.

In August of 2013, Hollis completed a medical source statement of Nicley's ability to perform work-related activities. See Transcript at 359-362. Hollis diagnosed Nicley with "lumbar HNP," commonly known as a herniated disc, and represented that she is "unable to sit, stand, or walk but short amount[s] of time." See Transcript at 359. Hollis credited Nicley's subjective complaints of severe pain and fatigue and opined that her pain and fatigue prevented her from, inter alia, sitting in an office chair for more than two hours at one time during an eight hour workday; standing and/or walking for more than two hours at one time during an eight hour workday; lifting and/or carrying more than ten pounds at one time; and bending, twisting, stooping, climbing ladders, or reaching. Hollis opined that Nicley is unable to complete the demands of a typical eight hour workday.

The non-medical evidence is contained, in part, in a pain form and function report Nicley completed in connection with her applications for disability insurance benefits and supplemental security income payments. See Transcript at 193-202. In the pain form, she represented that she requires a nap or rest at least twice or more a day for between one to two hours at a time. She can stand/walk for only about one to two minutes before she experiences pain and can sit for only about fifteen to twenty minutes before she experiences pain. Physical activity causes her continual pain all over her body. In the function report, she represented that a typical day consists of getting up, staying inside, and watching television, although she is able to go outside on occasion. She can attend to her personal care, but it takes longer for her to do so. She cannot prepare meals, is unable to shop, can do light housework but cannot work outside, and attends church when she is physically able.

Nicley testified during the administrative hearing, and her testimony conformed to the representations she made in the pain form and function report. See Transcript at 27-41. She additionally testified that she does not drive an automobile because it hurts to use the pedals. She props her feet up during the day and must do so for approximately four to five hours a day. She worked for many years at Martin Sprocket and Gear, a work record the ALJ characterized as "good years of service," see Transcript at 29, and Nicley only stopped working there because of the heavy lifting required by the job. The medication prescribed by Hollis helps relieve Nicley's pain, and she experiences no side effects from the medication.

-6-

The ALJ found at step two of the sequential evaluation process that Nicley's severe impairments include degenerative disc disease of the lumbar spine, hip pain, and bilateral knee pain.[4] The ALJ assessed Nicley's residual functional capacity and found that she can perform a reduced range of light work. In making the assessment, the ALJ gave great weight to Randolph and Troxel's opinions but little weight to Hollis' opinions.

The ALJ's decision to accord little weight to Hollis' opinions is not something the Court takes lightly. A treating physician like Hollis is "usually more familiar with a claimant's medical condition than are other physicians …" See Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) [internal quotation omitted]. In this instance, though, substantial evidence on the record as a whole supports the ALJ's decision to accord little weight to Hollis' opinions. The Court so finds for three reasons.

First, the ALJ could and did discount Hollis' opinions because they are inconsistent with his own treatment records. To the extent Hollis' progress notes contain specific findings, the findings are minimal. It is true that he noted her severe pain, but it appears that he was simply recording her self-reports. In addition, Hollis noted on more than one occasion that the severity of Nicely's pain improved over time with prescription medication, a fact she confirmed during the administrative hearing. In short, his progress notes do not support the severe restrictions he articulated in the medical source statement.

---

4

The ALJ found that Nicley's severe impairments also include a depressive disorder and obesity. Nicley does not challenge the ALJ's findings with respect to those impairments.

Second, the ALJ could and did discount Hollis' opinions because they are inconsistent with the medical testing. The x-rays performed at St. Bernards Medical Center reflect that Nicley has mild degenerative changes in her lumbar spine but no fractures or displacements, minimal degenerative changes in her hips, and no bony abnormalities in her right knee. The results of the x-rays provide a medical basis for the pain she experiences in her lumbar spine and hips. The results cannot be fairly characterized, though, as significant, and they do not support the severe restrictions Hollis articulated in the medical source statement.

Third, the ALJ could and did discount Hollis' opinions because they are inconsistent with the opinions of the consulting physicians. Randolph and Troxel are admittedly consulting physicians, and their opinions are not entitled to controlling weight. See Anderson v. Heckler, 738 F.2d 959 (8th Cir. 1984). The ALJ could and did nevertheless give their opinions greater weight than Hollis' opinions. The ALJ could and did do so because Randolph and Troxel's opinions are consistent with Hollis' progress notes and the medical testing performed at St. Bernards Medical Center. The ALJ's decision to give greater weight to Randolph and Troxel's opinions was not outside the "available zone of choice."[5]

---

[5]

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." See Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995) [internal quotation omitted]. The manner in which an ALJ resolves a conflict will be disturbed only if it falls outside the "available zone of choice." See Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) [internal quotation omitted]. A decision is not outside the "available zone of choice" simply because the court may have reached a different conclusion had it been the finder of fact. See Id.

Nicley faults the ALJ for failing to consider Hollis' diagnosis of "lumbar HNP." Specifically, Nicley notes that a July of 2003 MRI found a "disc bulge at L4/5 and a disc herination at L5/S1 with compromise of the nerve root," see Document 12 at 8, and the results should have been considered in assessing her residual functional capacity.

Admittedly, the ALJ gave little consideration to Hollis' diagnosis of "lumbar HNP" and made no mention of the results of Nicley's July of 2003 MRI. The ALJ's failure to do so, though, does not warrant a remand for four reasons.

First, the record does not contain the results of the July of 2003 MRI. Although Nicley's attorney made mention of the MRI in his opening remarks, see Transcript at 26, the results were not made a part of the record.

Second, notwithstanding the foregoing, it is not clear if Hollis reviewed the results of the July of 2003 MRI before offering his opinions. His medical source statement makes no mention of the results. See Transcript at 359-362.

Third, assuming Hollis reviewed the results of the July of 2003 MRI before offering his opinions, the ALJ could still discount Hollis' opinions. As the Court found above, Hollis' opinions are inconsistent with with his own treatment records, the other medical testing, and the opinions of the consulting physicians.

Fourth, the results of the July of 2003 MRI are of questionable weight on the issue of the most Nicley can perform. The MRI was performed approximately seven years before Nicley alleges she became disabled, and the impairment did not prevent her from working a full-time job.

As a part of assessing Nicley's residual functional capacity, the ALJ noted his obligation to consider her subjective complaints. He correctly articulated the prevailing standard for considering her complaints, i.e., Polaski v. Heckler, and represented that he evaluated her complaints in accordance with that standard. He concluded that her complaints were not fully credible. The ALJ's evaluation of Nicley's complaints is not a model of thorough legal analysis as he made no specific findings. Substantial evidence on the record as a whole nevertheless supports his conclusion regarding her complaints.

Nicley represented that her daily activities consist primarily of getting up, staying inside most of the day, and watching television. She can attend to her personal care but cannot prepare meals, shop, or do more than light housework. She can attend church but can only do so when she is physically able. Although the Court accepts that her daily activities are as she represented, the ALJ could discount Nicley's representations. There is no evidence, medical or otherwise, to support such an extreme limitation of her daily activities. It is not inconceivable that the extent of her daily activities is more the product of a personal choice than disabling pain.

With respect to the duration, frequency, and intensity of pain, Nicley represented that she can stand/walk for only about one to two minutes before she experiences pain and can sit for only about fifteen to twenty minutes before she experiences pain. She also represented that physical activity causes her continual pain all over her body. The ALJ could discount Nicley's representations as there is no evidence, medical or otherwise, to support such an extreme limitation of function.

Nicley testified that she takes prescription medication, medication that causes no side effects. Although the medication does not alleviate her pain altogether, it does help relieve her symptoms. Thus, her pain is not as severe when she takes appropriate medication.

With respect to other matters, Nicley testified she must prop her feet up during the day and must do so for approximately four to five hours a day. There is no evidence, though, that a medical professional recommended she do so, and there is no evidence, medical or otherwise, that she must do so. Nicley also testified to her work history, which the ALJ acknowledged was good. Although her work history buttresses her credibility, that fact alone does not cause the Court to second-guess the conclusion made by the ALJ.

"The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." See Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). In this instance, Nicley has not offered a valid reason for deviating from that rule. The evaluation of her subjective complaints made by the ALJ, while by no means thorough, is adequate and one of the acceptable interpretations of all the evidence.

Nicley offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. She maintains that he posed an improper hypothetical question to a vocational expert. Nicley maintains that the hypothetical question was improper because it failed to include all of the work-related limitations her impariments cause.

-11-

Testimony from a vocational expert is substantial evidence on the record as a whole when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The question must include all of the claimant's impairments that are substantially supported by the record as a whole. See Id.

A vocational expert testified during the administrative hearing. See Transcript at 41-57. He was presented with a series of questions regarding a hypothetical individual with Nicley's limitations. The vocational expert testified that the hypothetical individual could not perform Nicley's past work but could perform work as a motel cleaner, assembler, and production inspector. The ALJ adopted the vocational expert's testimony and found that there is other work Nicley can perform.

The ALJ did not err in crafting the hypothetical questions. They captured the concrete consequences of Nicley's limitations and were adequately phrased. Nicley faults the ALJ for failing to incorporate into the questions the limitations found by Hollis, but the ALJ could and did properly refuse to do so. Hollis' opinions of Nicley's work-related abilities are inconsistent with his own treatment records, the medical testing, and the opinions of the consulting physicians, and Hollis' opinions could be discounted.

Nicley offers a third reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. She maintains that the vocational expert did not provide reliable job numbers coinciding with the jobs he identified. The specifics of her assertion are as follows:

-12-

The vocational expert testified that there are 370,000 jobs nationally for a motel cleaner …, 53,000 jobs nationally for a plumber hardware assembler …, and 128,000 jobs nationally for a production inspector … The vocational expert testified that these number of jobs were actually for the entire OES [i.e., Occupational Employment Survey] group of jobs … The vocational expert was unable and actually appeared unwilling … to provide how many different DOT [i.e., Dictionary of Occupational Titles] jobs were in each group and the exertion and skill levels of those other jobs. …

The motel cleaner … job has 9 separate DOT jobs in the group of jobs the vocational expert provided job numbers for … Five of the nine jobs are at the medium and heavy exertional level, one of the light jobs is semi-skilled …, and one of the light jobs has a reasoning level of 3 …

The plumbing-hardware assembler job has 1526 separate DOT jobs in the group of jobs the vocational expert provided job numbers for … Many of the 1526 jobs are medium and heavy; semi-skilled and skilled; reasoning level 3 and above; and some of them violate other limitations in the hypothetical question …

The Lamp Tester/Inspector job has 782 separate DOT jobs in the group of jobs the vocational expert provided job numbers for … Many of these 782 jobs are at the medium and heavy level, the vast majority of the light DOT jobs in this group are semi-skilled and skilled, many of the others are above a reasoning level 3, and many of the other DOT violate other limitations of the hypothetical. …

See Pleading 12 at 14-15.

A vocational expert does not testify as a census taker or statistician. See Kelly v. Colvin, 2015 WL 94252 at 5 (E.D.Mo. 2015). Instead, the vocational expert is required to state his opinion as to the number of jobs available in the national economy for a hypothetical individual with the claimant's residual functional capacity, age, education, and work experience. See Whitehouse v. Sullivan, 949 F.2d 1005 (8th Cir. 1991).

The vocational expert identified the jobs a hypothetical individual with Nicley's

limitations could perform, the Dictionary of Occupational Titles ("DOT") listing for each job, and the number of such jobs available at the state, regional, and national levels. The vocational expert recognized that some of the jobs within each DOT listing required work-related abilities greater than the hypothetical individual could perform so the vocational expert "reduced the number [of jobs within the DOT listings] significantly because of the groupings." See Transcript at 53. The vocational expert based his reduction upon statistics provided by the United States Department of Labor. Specifically, he relied upon statistics from the "BLS," which the Court understands to be the United States Bureau of Labor Statistics, and "U.S. Publishing," which the Court understands to be market statistics on employment by occupation. See Transcript at 46-47. He also represented that his testimony was based upon his twenty-one years of experience. The ALJ adopted the vocational expert's testimony and found there are a sufficient number of jobs available the hypothetical individual could perform.

The ALJ did not err in adopting the vocational expert's testimony regarding the number of jobs available to a hypothetical individual with Nicley's limitations. The vocational expert relied upon acceptable sources in formulating his answers and in reducing the number of jobs available within each DOT listing. Nicley appears to maintain that the vocational expert must testify to the number of jobs available with an absolute certainty. Nicley has cited no authority for that proposition, and the Court knows of none.

Given the foregoing, there is substantial evidence on the record as a whole to

support the ALJ's findings. Accordingly, Nicley's complaint is dismissed, all requested

relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 21st day of January, 2016.

_____

UNITED STATES MAGISTRATE JUDGE